No. 93,587

STATE OF KANSAS, *Appellee*, v. AARON R. ALGER, *Appellant*.

145 P.3d 12

Opinion filed October 27, 2006.

*Patrick H. Dunn*, Kansas Appellate Defender, argued the cause, and *Virginia A. Girard-Brady*, of the Kansas Appellate Defender Office, was with him on the brief for appellant.

*Ruth A. Ritthaler*, of Case, Moses, Zimmerman & Wilson, P.A., of Yates Center, argued the cause, and *Phill Kline*, attorney general, was with her on the brief for the appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Aaron Alger brings this direct appeal from his first-degree felony-murder conviction in the child abuse homicide of his girlfriend's 2-year-old daughter, Alexis Murray.

Defendant raises four issues: (1) Did the district judge err by admitting an unredacted videotape of his statements? (2) Did coercive interrogation techniques employed by law enforcement render his statements involuntary? (3) Did the prosecutor commit reversible misconduct during opening statement? and (4) Does cumulative trial error require reversal?

Alexis was under defendant's care while her mother, Misty Sobely, was at work. On August 29, 2003, emergency medical technicians and Coffeyville police were called to Sobely's home, where they found Alexis unconscious.

Defendant eventually testified that he discovered Alexis lying face down on the floor shortly after he and she had taken her mother to work. When defendant turned Alexis over, he said, her face was pale and her lips were blue; he attempted C.P.R. and then called 911. Defendant also testified that he had told paramedics Alexis tripped because he thought that might have happened.

Because the police officer at the scene noticed various suspicious bruises on Alexis he summoned Detective Diane George. George spoke briefly with defendant at the scene, and Alexis was taken to the hospital.

Defendant agreed to give a statement at the police station. His first interview with George lasted approximately 43 minutes, and a transcript prepared from an audiotape of the interview was admitted into evidence at trial by defense counsel.

Regarding this first interview, George testified that defendant attributed a bruise on Alexis' chest to a dog who knocked her down 4 days earlier. Defendant also said he had taken Alexis to her doctor after the dog incident. Defendant attributed Alexis' other bruises to accidents or playing with her brothers or roughhousing.

During a break in this first interview, George learned two things. First, a treating physician suspected Alexis had been dropped or shaken and, second, Alexis had not been to her doctor in connection with the dog incident. When George confronted defendant with this new information, defendant admitted he had not taken Alexis to her doctor. Rather, he said, he had taken her to the hospital and then left after waiting 3 or 4 hours without seeing anyone. He also offered more specific explanations for Alexis' other bruises: One on her temple could have been from a fall against a bed; one on her cheek could have been from a time when he had scared her and she fell and hit a bed rail.

George then interviewed Sobely, who said defendant, as Alexis' primary care-giver, bathed, fed, and dressed her. Sobely said she had not had responsibility for bathing Alexis for at least 2 weeks but that she appeared fine when Sobely saw her. Sobely also said that defendant had called her at work about the dog incident, saying he left the toddler in a room with the dog, and she started screaming. Sobely told defendant to take Alexis to the doctor, and he told her later that the doctor's office was closed and he had instead taken Alexis to the hospital and everything was fine.

Later on the day Alexis was taken to the hospital, George asked defendant to return to the police station for a second interview. Defendant's version of the events of the day remained the same. He conceded that all of the bruises on Alexis' body resulted from injuries she suffered while she was in his sole care. At one point during the interview, defendant asked George to turn off the tape recorder; he then said the bruise on Alexis' cheek appeared after he had spanked Alexis, causing her to fall against the bed rail.

George's second interview of defendant lasted approximately 1 hour and 20 minutes. Again, a transcript of the taped portion was admitted into evidence at trial by defense counsel.

Detectives learned from the hospital that Alexis had a skull fracture and hemorrhaging associated with Shaken Baby Syndrome. George and Detective Brian Richstatter then interviewed defendant again the day after Alexis went to the hospital. This time, the detectives told defendant that he was a suspect and he received his *Miranda* warnings orally and in writing. Defendant waived his

*Miranda* rights and requested that the tape recorder be turned off. He was unaware that this third interview was nevertheless videotaped.

Again, defendant offered explanations for Alexis' bruises, suggesting that they were the result of his playing with her. In response to George's questions, he finally admitted that he had lost control with Alexis, and that he had shaken her on at least two previous occasions, the most recent occurring 2 days before she went to the hospital. Defendant said that "[he] was tired and cranky, didn't want to hear it, and [he] slammed her on the potty and shook her." Defendant nevertheless consistently denied shaking Alexis on the day that she was found unconscious. He also suggested that Alexis may have hit her head on a speaker near the door of Sobely's home; however, police who had responded to the scene had seen no objects near Alexis that might have caused her injury.

The day after the third interview, detectives made two trips to the Sobely home to investigate. During the second trip, Richstatter attempted to arrest defendant on an aggravated battery charge; defendant attempted to flee and was apprehended.

Alexis died 2 days later, on September 1, 2003.

At trial, Jennifer Shull testified that she had lived with Sobely and defendant and that Sobely disciplined Alexis when Sobely was home. When Sobely was not at home, defendant "seemed like he was annoyed" with Alexis and spanked her too hard. She testified that she had seen defendant shake Alexis and then throw her on the couch on one occasion.

Three experts testified at defendant's trial regarding the cause of Alexis' death.

Dr. Donald Pojman, the deputy coroner who performed the autopsy on Alexis, and Dr. Katherine Melhorn, a pediatrician who treated Alexis, testified on behalf of the State. They said closed cranial injuries resulting from physical abuse caused Alexis' death. These experts agreed that Alexis' head trauma resulted from shaking or from impact with an external source, either because she was thrown against something or had something thrown against her. Pojman testified that Alexis' death could not have been accidental

and specifically was not the result of either a dog attack or tripping over any object.

In addition, Pojman testified that there were 45 to 50 bruises covering Alexis' body and concentrated on her back and face. Melhorn testified, within a "reasonable degree of medical certainty," that after an injury such as that Alexis suffered, Alexis would not have been acting normal or playful and would have exhibited symptoms ranging from irritability, lethargy, and vomiting to seizures and the onset of a semicomatose state.

Dr. Richard Charles Gilmartin, a pediatric neurologist, testified on behalf of the defense. Based on reports provided him, Gilmartin testified that Alexis' fatal injury occurred some time before the onset of symptoms. He opined that the injury that caused Alexis' death would not have been readily apparent and that Alexis had probably suffered shaking or a blow to her head hours or even days earlier. In his view, Alexis' fatal injury could not have occurred the morning of August 29 while she was alone with defendant.

At trial, defendant admitted that he had gotten rough with Alexis 2 days before she was found unconscious, when she was screaming and ornery and indicated that she needed to go to the bathroom. He said that he "picked her up, shook her a little bit—got the hair out of her face . . . and sat her down on the potty," but the shaking was "not harmful." He again denied that he had shaken Alexis on August 29.

The State introduced the videotape of defendant's third interview by George and Richstatter, with a passage relating to defendant's refusal to take a polygraph examination muted.

Defendant was convicted of both felony murder and child abuse, but the district judge vacated his child abuse conviction on double jeopardy grounds. Defendant was sentenced to life in prison.

### Admission of Unredacted Videotape

Alger argues on appeal that the videotape of his third interview, which was played for the jury at trial without objection, should have been redacted to remove repeated comments by George regarding his lack of credibility or veracity. On the videotape, the detective, although unfailingly courteous and gentle, expresses doubt about

defendant's evasiveness and repeatedly says that he is not being truthful.

Defendant relies on *State v. Elnicki,* 279 Kan. 47, 53, 105 P.3d 1222 (2005), in which this court held that admission of an unredacted videotape of an interrogation in which a law enforcement officer commented repeatedly on the defendant's credibility was reversible error. We stated in *Elnicki* that a district judge has no discretion to admit such evidence; there is "an absolute prohibition against admission of this type of evidence" because, as a matter of law, a witness may not express an opinion on the credibility of another witness. 279 Kan. at 53-54.

In *Elnicki,* however, the defendant had preserved the issue for consideration on appeal through an appropriate and timely objection in the trial court. In this case, defendant did not object.

We discussed the necessity of an objection to preserve an *Elnicki* issue in *State v. Anthony,* 282 Kan. 201, 212, 145 P.3d 1 (2006). In that appeal, like this one, the defendant argued that the State's admission of an unredacted videotape of his interrogation was error, but he had not objected to the admission of the video at trial. In such a situation, we will not address the merits of the issue on appeal; a contemporaneous and appropriate objection at trial is indispensable.

As we state in *Anthony,* this requirement of a timely and appropriate objection in the district court is consistent with the facts of the cases that underlay the *Elnicki* decision. See *Anthony,* 282 Kan. at 213 (citing *State v. Plaskett,* 271 Kan. 995, 1008-09, 27 P.3d 890 [2001]) (trial court erred in allowing detective to express opinion whether child victim was telling the truth); *State v. Manning,* 270 Kan. 674, 698, 19 P.3d 84 (2001) (questions compelling defendant or witness to comment on credibility of another witness improper); *State v. Mullins,* 267 Kan. 84, 97, 977 P.2d 931 (1999) (line of inquiry equivalent to asking one witness if another witness was telling the truth held improper, error in allowing answer); *State v. Steadman,* 253 Kan. 297, 304, 855 P.2d 919 (1993) (admission of witnesses' testimony that in their opinion the defendant was guilty deprived defendant of fair trial); *State v. Jackson,* 239 Kan. 463, 470, 721 P.2d 232 (1986) (error for trial court to permit witnesses

to testify and tell jury that, in their opinions, defendant committed the charged act); *State v. Lash,* 237 Kan. 384, 386, 699 P.2d 49 (1985) (question which called for expert to express opinion about witness' credibility improper); see also *State v. Arrington,* 251 Kan. 747, 751-53, 840 P.2d 477 (1992) (challenge to two portions of expert's testimony on credibility of child's account of sexual molestation; on appeal, court reversed on one portion, which was accompanied by an objection, but refused to consider other portion because of no objection). Further, as a practical matter, without an objection,

"an appellate court cannot assume that the playing of an unredacted interrogation videotape is something the defense wants to avoid. In fact, in many criminal cases, having lost a motion to suppress a confession, the defense may want such a tape played without redactions to demonstrate what it argues is overreaching or unfair trickery by law enforcement." See *Anthony,* 282 Kan. at 213.

Here, defendant asserts that coercion and deceptive tactics of law enforcement rendered his statements involuntary and therefore inadmissible. Moreover, it was defendant, rather than the State, who introduced the transcripts of his two earlier audiotaped interviews, possibly as part of an effort to persuade the jury that the detectives' interrogation methods were unfair. Without a motion to suppress or an objection to the admission of the videotape of the third interview, it appears just as likely as not that the defense actually wanted the jury to see the video because it would provide additional support for its argument regarding the detectives' conduct. Certainly, defense counsel demonstrated no contrary opinion. The trial transcript reveals counsel requested that the jury be permitted to view the video in its entirety at one sitting rather than over a 2-day period.

Without a contemporaneous objection to admission of an unredacted interrogation videotape at trial, defendant is precluded from pursuing his *Elnicki* argument on appeal. See *Anthony,* 282 Kan. at 213-14; *State v. Kunellis,* 276 Kan. 461, 477, 78 P.3d 776 (2003); *State v. Williams,* 275 Kan. 284, 288, 64 P.3d 353 (2003).

### *Voluntariness of Statements*

Defendant next argues that the detectives elicited involuntary

incriminating statements from him by misrepresenting the seriousness of Alexis' condition, by downplaying the severity of his potential criminal liability, and by encouraging him to speculate about how Alexis' injuries could have occurred. These techniques, he asserts, were coercive and rendered his statements inadmissible under the Fifth and Fourteenth Amendments to the United States Constitution.

As with the unredacted videotape, no motion to suppress was filed in the district court and no objection lodged to the admission of the statements at trial. Generally, when constitutional grounds are asserted for the first time on appeal, they are not properly before this court for review. *Williams*, 275 Kan. at 288. Although we have at times employed one or more of three exceptions to this rule—(1) The newly asserted claim involves only a question of law arising on proved or undisputed facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason, *State v. Schroeder*, 279 Kan. 104, Syl. ¶ 9, 105 P.3d 1237 (2005),—we are not required to do so. In this case, where defense counsel never even attempted to have the statements excluded by means of a motion to suppress, we decline to reach the merits of this claim.

### Prosecutor's Opening Statement

Alger argues that the prosecutor committed misconduct in violation of his constitutional right to a fair trial through inflammatory and argumentative comments during opening statement. Specifically, the prosecutor said, "Alexis Murray will forever be two years old and her last memory will forever be that of the Defendant violently shaking the life out of her." The prosecutor also said the evidence would "compel you to convict the defendant in this case" and stated, "Once you've heard all this testimony, you'll be compelled to give the defendant his last memory of these proceedings. You'll find him guilty of murder in the first degree and child abuse."

There was no defense objection to any of these statements. However, a defendant need not object to alleged prosecutorial miscon-

duct in order to preserve the issue for appeal; the same standard of review applies regardless of whether an objection was made in the district court. See *State v. Dixon*, 279 Kan. 563, 581, 112 P.3d 883 (2005).

We apply a two-step analysis for allegations of prosecutorial misconduct. *State v. Overton*, 279 Kan. 547, 558-59, 112 P.3d 244 (2005) (prosecutorial misconduct during cross-examination); *State v. Tosh*, 278 Kan. 83, Syl. ¶ 3, 91 P.3d 1204 (2004) (prosecutorial misconduct during closing argument). We look first at whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence and second at whether the remarks constituted plain error, *i.e.*, whether the statements prejudiced the defendant and denied him or her a fair trial. *Dixon*, 279 Kan. at 590-91.

The second step requires three factors to be considered: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *Dixon*, 279 Kan. at 592. None of these factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmlessness tests of both K.S.A. 60-261 (refusal to grant new trial would be inconsistent with substantial justice) and the federal harmless error rule delineated in *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (beyond a reasonable doubt, error had little, if any, likelihood of having changed the result of the trial), have been met. *Tosh*, 278 Kan. 83, Syl. ¶ 2.

Defendant argues the prosecutor's statements "clearly exceeded the permissible scope of an opening statement" and served no purpose other than to inflame the jury against the defendant by invoking sympathy for Alexis. He notes we have held that the opening statement has a narrow purpose and scope. It is not evidence; and it is given only to assist the jury in understanding what each side expects its evidence to establish and to advise the jury what questions will be presented for its decision. See *State v. Kleypas*, 272 Kan. 894, 957, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834

(2002), *overruled in part on other grounds by State v. Marsh,* 278 Kan. 520, 102 P.3d 445 (2004); *State v. McCorkendale,* 267 Kan. 263, 277, 979 P.2d 1239 (1999).

Although it may be true that the prosecutor in this case danced on the line between mere recitation of the expected evidence and forbidden argument, he did not step over it. The "last memory" rhetorical device was colorful, but it was not error. The State's expert evidence supported its theory that Alexis lost consciousness immediately after her fatal injury and never regained it; thus, to the extent a 2-year-old could have developed a memory in the way that an adult conceives of the term, her last memory would have been of that injury, allegedly inflicted by defendant. In addition, the determination of defendant's guilt or innocence of the charged crimes was the ultimate question the jury was called upon to address. It is the prosecutor's role to seek a conviction. The prosecutor merely stated the obvious when he asserted that the evidence would compel a guilty verdict.

In the absence of any error, we need not analyze whether error was plain. Defendant is not entitled to reversal of his conviction for prosecutorial misconduct.

*Cumulative Error*

Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Plaskett,* 271 Kan. 995, 1022, 27 P.3d 890 (2001). Seeing no error in defendant's trial, we cannot apply the cumulative error rule here.

Affirmed.