No. 96,883

STATE OF KANSAS, *Appellee*, v. PAUL C. HUNT, *Appellant*.
(176 P.3d 183)

Opinion filed February 8, 2008.

*Carl Folsom, III*, of Kansas Appellate Defender Office, argued the cause and was on the brief for the appellant.

*Nathan Paul Eberline*, assistant solicitor general, argued the cause, and *Jared S. Maag*, deputy solicitor general, and *Paul J. Morrison*, attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Paul C. Hunt appeals his conviction for first-degree, premeditated murder in the death of his mother. Hunt's principal complaint involves the question of where the crime occurred. He also raises questions about the admissibility of evidence and the jury instructions, as well as claims of prosecutorial misconduct. Although we find some error in the conduct of the trial, we affirm the conviction.

On Sunday, June 23, 2002, family members of Mary Sue Taylor, a resident of Fort Scott, Bourbon County, Kansas, reported to law enforcement that Taylor could not be located. Taylor's vehicle was parked in the driveway, her house was unlocked, the television was on, and items that she would normally take with her were still in the house. Nothing appeared out of the ordinary inside or outside the house. Neighbors reported last seeing Taylor the morning of June 20. Taylor had not appeared at her job on June 22 and 23.

At the time of the disappearance, Hunt and his minor child, Ryan, had been living with Taylor, albeit Hunt and his mother had a volatile, contentious relationship. Hunt told police that he last saw his mother at about 10:40 p.m. on June 20, before he left for work. Upon completing his shift on the morning of June 21, Hunt did not return to his residence before going to the house of his girlfriend, Tammy Rees, in Cartersville, Missouri. His son, Ryan, was also out of town, visiting maternal grandparents. After spending the weekend with Rees, Hunt returned to the Fort Scott home about 10:30 p.m. on Sunday, June 23, where the investigation into Taylor's whereabouts had commenced.

Several days later, on June 29, Taylor's body was found floating in a strip pit in Crawford County. The body was wrapped in a gray tarp which was tied with rope and taped, and the tarp-wrapped body was inside a sleeping bag which had also been wrapped with rope and tape. A rope was around the victim's neck. The coroner opined that Taylor died of ligature asphyxiation and ruled the death a homicide, albeit he could not determine the date of death. The coroner described the manner in which the body had been wrapped and secured with rope and tape as a fairly complicated and involved mechanism.

Hunt's behavior both before and after the discovery of Taylor's body caused some suspicion. The weekend of Taylor's disappearance, Hunt took some of Taylor's clothing to his girlfriend, saying that his mother wanted the girlfriend to have it. He also brought camping equipment and stored it in his girlfriend's shed. Later testing revealed that two ropes found with the equipment were consistent with the color, construction, and chemical composition of the rope around the victim's neck.

On the day before the discovery of the body, Hunt and a friend were leaving a convenience store in Missouri when police stopped Hunt's pickup. Hunt declared to his friend: "[M]an, I'm in trouble," and fled afoot after imploring his friend not to disclose that Hunt was driving. The police did not pursue Hunt, and the friend thought Hunt was concerned about being arrested for driving under the influence.

The day after the body was discovered, Hunt called his girlfriend to say that he was leaving town. He left his son with a brother but did not tell family members he was leaving. The following day he asked his girlfriend to bring soda and cigarettes to a park in Joplin, Missouri, where he planned to spend the night. He then rode a freight train to Kansas City, but then hitched a ride on a southbound freight train, eventually winding up in Emporia. There, he called his brother, Patrick, on July 4 asking Patrick to get him a motel room and to provide him with a ride back to Fort Scott.

Hunt did not attend his mother's funeral, ostensibly because his brother, Patrick, and an uncle were accusing Hunt of being the murderer. Hunt subsequently left the Fort Scott area, first going to live with Ryan's maternal grandparents in Missouri. He was in Pennsylvania when he was arrested in March 2005.

Police also located a witness who had observed a pickup truck parked in a low-lying area, adjacent to a strip pit situated on the Missouri side of the Missouri-Kansas border, near evening on June 20, 2002, the last day that Taylor was seen alive. The witness, who owned land containing strip pits in the area, proceeded to investigate whether someone was fishing on his land. As the witness approached the pickup, he observed a person initially standing next to the passenger door who then entered the pickup on the driver's side. Upon making contact with the pickup driver, the witness observed a motionless person in the passenger seat covered with a blanket or sleeping bag. In answer to the witness' inquiry, the pickup driver said the passenger was his sleeping fiancée. Being suspicious of a person being covered up with a blanket in hot weather, the witness went to the local sheriff's office to report his concerns. At trial, the witness could not identify Hunt, other than to say that he was about the same size as the pickup driver. Like-

wise, the witness' recollection of the pickup was limited to describing it as being a dark color which comported with the color of Hunt's pickup.

Because Taylor's body was discovered in Crawford County, Hunt was tried in that county. The jury convicted him of first-degree, premeditated murder.

## VENUE

Hunt's first four issues involve the question of where the act of first-degree murder occurred, *i.e.*, whether Crawford County was the proper venue. Venue must be proved to establish the jurisdiction of the court; it is a question of fact to be determined by the jury, albeit the existence of jurisdiction is a question of law, subject to unlimited appellate review. *State v. McElroy*, 281 Kan. 256, 264, 130 P.3d 100 (2006).

Although the State argued at trial that the act which caused Taylor's death occurred in the Bourbon County residence, the charging instrument alleged:

"That on or about June 20, 2002, Paul C. Hunt, did, *in Crawford County, Kansas*, contrary to the statutes of the State of Kansas, unlawfully, feloniously, intentionally, and with premeditation kill a human being, to wit: MARY 'SUE' TAYLOR, in violation of K.S.A. 21-3401(a)." (Emphasis added.)

The Kansas Constitution Bill of Rights, § 10 provides, in relevant part: "In all prosecutions, the accused shall be allowed . . . a speedy public trial by an impartial jury of *the county or district in which the offense is alleged to have been committed*." (Emphasis added.) Statutorily, the place of a criminal trial is designated as follows: "Except as otherwise provided by law, the prosecution shall be *in the county where the crime was committed*." (Emphasis added.) K.S.A. 22-2602.

A specific statute deals with the situation in which death and the cause of death occur in different places: "If the cause of death is inflicted in one county and the death ensues in another county, the prosecution may be in either of such counties." K.S.A. 22-2611. The same statute creates a presumption to assist in determining venue in murder cases. Specifically, "[d]eath shall be presumed to

have occurred in the county where the body of the victim is found."
K.S.A. 22-2611.

Hunt contends that (1) the evidence was insufficient to establish
that the crime occurred in Crawford County; (2) he was denied his
constitutional right to be tried in the county where the crime al-
legedly occurred; (3) the jury instructions were clearly erroneous
in omitting the essential element of venue; and (4) the jury instruc-
tions were clearly erroneous in omitting an instruction on the pre-
sumption provided by K.S.A. 22-2611.

*Sufficiency of the evidence*

Hunt argues that the evidence was insufficient to establish the
venue element of first-degree murder, in that the State did not
prove that the murder occurred in Crawford County, as opposed
to Bourbon County. Our familiar review standard requires us to
"consider all of the evidence, viewed in a light most favorable to
the prosecution." See *State v. Parker*, 282 Kan. 584, 597, 147 P.3d
115 (2006).

Hunt does not appear to challenge the venue rule of K.S.A. 22-
2611 that a murder is deemed committed in either the county
where the injury that was the cause of death was inflicted or the
county in which the death ensued. Obviously, one cannot have
committed the crime of murder until the victim dies. Likewise,
Hunt acknowledges that the statutory presumption that the death
occurred in the county where the victim's body was found has been
approved by this court as a practical necessity. See *State v. Mc-
Kibben*, 239 Kan. 574, 578, 722 P.2d 518 (1986).

Hunt's challenge focuses on the State's closing argument, in
which the prosecutor inexplicably suggested that Taylor was dead
when Hunt wrapped her in the tarp and sleeping bag at the Fort
Scott, Bourbon County, residence. One might find it curious that
a prosecutor relying on a presumption that death occurred in Craw-
ford County to establish an essential element of the charged crime
would present a scenario in closing argument which contradicts the
presumption. On the other hand, Hunt's attorney argued that the
undisturbed condition of the residence and other evidence pre-
sented at trial contradicted the State's proffered scenario and de-

clared that there was "no physical evidence of any kind that the State has presented . . . that Mary Sue Taylor died in that [Fort Scott] house." In other words, the prosecutor appeared to argue against the presumption, while the defense argued that the evidence was consistent with the presumption.

Nevertheless, Hunt's argument falters because he attempts to equate the prosecutor's arguments with the State's evidence. A prosecutor's supposition as to what might have happened is not a substitute for evidence, and the jury was advised accordingly. Instruction number two specifically advised the jurors that "[s]tatements, arguments and remarks of counsel . . . are not evidence."

The parties stipulated that it was Taylor's dead body which was found in the Crawford County strip pit on June 29, 2002. That evidence was sufficient to trigger the statutory presumption that Taylor died in Crawford County and present a prima facie showing of the venue element of the murder charge. Contrary to Hunt's contention, the State's *evidence* did not rebut the presumption. Indeed, the coroner could not pinpoint the *day* on which Taylor died, much less the place of death. When viewed in the light most favorable to the State, the evidence was sufficient to establish that, legally, the murder occurred in Crawford County.

## Constitutional violation

Hunt contends that, alternatively, he was denied his constitutional right to have his case tried in the county where the crime allegedly occurred, as was guaranteed to him by the Kansas Constitution Bill of Rights, § 10. Hunt concedes that he did not object to venue in the district court on any basis, much less raise a constitutional question. See *State v. Alger*, 282 Kan. 297, 304, 145 P.3d 12 (2006) (constitutional grounds for reversal raised for the first time on appeal are not properly before the appellate court).

Nevertheless, the argument is factually flawed. Hunt relies on the prosecutor's statements in closing argument to support the argument that the State was alleging the offense occurred in Bourbon County. However, the complaint filed against Hunt clearly alleged that the act of murder occurred in Crawford County. The prose-

cutor's statements in closing argument, while arguably ill-advised or counterintuitive, cannot trump the official charging instrument so as to alter or modify the county in which the offense was alleged to have been committed. Thus, Hunt was afforded exactly what the Kansas Constitution guarantees, *i.e.*, a speedy public trial by an impartial jury of the county in which the offense was alleged to have been committed in the official charging instrument.

*Jury instructions*

In his third and fourth issues, Hunt challenges the manner in which the district court instructed the jury on the venue element of the murder charge. He first asserts that the trial court erroneously accepted the State's proffered modification to the elements instruction for murder and thereby effectively omitted the essential element of venue from the jury's consideration. Next, Hunt contends that the district court should have included a separate instruction on the presumption set forth in K.S.A. 22-2611.

Hunt did not object to the portion of the jury instructions to which he now takes exception.

"The court reviews instructions by a clearly erroneous standard where there was no objection to the instructions at trial. Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003)." *State v. Griffin*, 279 Kan. 634, 661, 112 P.3d 862 (2005).

See K.S.A. 2006 Supp. 22-3414(3)

The trial court gave the following jury instruction:

"The defendant is charged with the crime of Murder in the First Degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally killed Mary Sue Taylor;

"2. That such killing was done with premeditation; and

"3. That this act occurred on or about the 20th day of June, 2002, *and the body of Mary Sue Taylor was found in Crawford County, Kansas*." (Emphasis added.)

If the trial court had strictly adhered to the applicable pattern instruction, PIK Crim. 3d 56.01, the venue element instruction would have read: "3. That this act occurred on or about the 20th

day of June, 2002, in Crawford County, Kansas." Utilizing the PIK language would have comported with the charging instrument.

The court and counsel discussed the instruction modification during a conference at which the parties presented the court with certain factual stipulations, one of which was, "The human body found in the strip pit in rural Crawford County, Kansas on the 29th day of June, 2002 was the body of Mary 'Sue' Taylor, DOB 10/7/49 (age 52)." After dealing with the stipulations, the following colloquy occurred:

"THE COURT: While we are back here, it is my understanding there is not going to be any issue as to venue from either party; is that correct?

"MR. BERNHART [defense counsel]: That's correct.

"THE COURT: Mr. Maxwell had suggested that in the jury instructions we indicate that the jury is to—is to find that one of the elements that the offense occurred either in Crawford or Bourbon County. I think you had indicated you had done this in the past.

"MR. MAXWELL [prosecutor]: Right. And here is what I wrote up, Judge, and since there is no problem with venue factually—

"THE COURT: Well, the statute indicates that there is a—a presumption that the alleged homicide occurred in the county in which the body was found.

"MR. MAXWELL [prosecutor]: Correct.

"THE COURT: And so—

"MR. MAXWELL [prosecutor]: I put—I wrote the instruction, just modified the PIK instruction just slightly in the last element of the PIK instruction that would apply for—that the body was found in Crawford County, Kansas because that establishes as a matter of law jurisdiction or venue.

"THE COURT: So the last element would read that the body was found in Crawford County as opposed to that the act occurred—

"MR. MAXWELL [prosecutor]: Right.

"MR. BERNHART [defense counsel]: No problem.

"THE COURT: All right. That's fine. I can then place something like that in the proposed jury instructions."

All concerned appear to have been laboring under the belief that finding Taylor's body in Crawford County established venue in that county, as a matter of law. That approach, in effect, would make the presumption in K.S.A. 22-2611 an irrefutable presumption. However, the State retained the burden to overcome the presumption of Hunt's innocence, notwithstanding the venue presumption in K.S.A. 22-2611. See K.S.A. 60-416 (burden of proof not relaxed where a presumption must be overcome by proof be-

yond a reasonable doubt). Thus, the State was still required to prove the claim that the act of murder occurred in Crawford County. In other words, the provisions of K.S.A. 22-2611 established only a rebuttable presumption that the place where the body was found was the place where the victim died and, accordingly, was one of the places where the act of murder occurred.

The jury should have been free to decide whether the presumption of the place of death had been refuted by the evidence. Accordingly, the modified elements instruction was erroneous. The jury should have been instructed that it must find that the act of murder occurred in Crawford County, Kansas, and additionally instructed on the provisions of K.S.A. 22-2611. However, reversal is not required.

As noted above, defense counsel specifically assured the court that venue would not be an issue in the case. In closing, defense counsel argued that the evidence did not support a finding that the death occurred at the Bourbon County residence, *i.e.*, that the evidence did not refute the place of death presumption. Under the circumstances, the elements instruction, while erroneous, was not clearly erroneous.

## EVIDENCE OF HABIT

Hunt's brother, Patrick, testified that he had observed his brother weld or secure items in the past, and that Hunt "would tend to overdo it" by using two or three pieces of tape when one piece was enough or by making several knots instead of one when securing a load. The prosecutor then asked Patrick, "Mr. Hunt, when you observed the photographs of the way that Mary Sue Taylor's body was packaged, what was your impression?" After the trial court overruled a defense objection, Patrick said that the packaging of Taylor's body "seemed to have been overdone."

Hunt acknowledges K.S.A. 60-449, which addresses the admissibility of relevant habit evidence:

"Evidence of habit or custom is relevant to an issue of behavior on a specified occasion, but is admissible on that issue only as tending to prove that the behavior on such occasion conformed to the habit or custom."

He further concedes that K.S.A. 60-450 permits a habit to be proved by opinion testimony or by evidence of specific instances of behavior. Accordingly, Hunt does not complain about the testimony describing his habit. However, he contends that Patrick's testimony about the packaging of Taylor's body appearing to be overdone was improper opinion testimony that invaded the province of the jury by determining that Hunt's habit conformed with the evidence of the crime.

Citing to *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005), Hunt contends that our review should be unlimited because the case presents constitutional considerations. He also asserts that the issue involves statutory interpretation, triggering unlimited review. See *State v. Maas*, 275 Kan. 328, 330, 64 P.3d 382 (2003). We disagree on both points; the case presents neither constitutional considerations nor statutory interpretation. Granted, "evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Carter*, 278 Kan. 74, Syl. ¶ 1, 91 P.3d 1162 (2004). In this case, however, the admissibility of Patrick's testimony was a matter of discretion for the trial court. See *State v. Gonzalez*, 282 Kan. 73, 80-81, 145 P.3d 18 (2006).

We are unpersuaded by Hunt's characterization of Patrick's testimony as being an opinion on the defendant's guilt. Accordingly, Hunt's reliance on *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993), where we said that police witnesses cannot testify that in their opinion the defendant was guilty of the crime, is misplaced.

Rather, Patrick was providing his opinion as to whether the packaging of Taylor's body was "overdone." Such an opinion is permissible under K.S.A. 60-456(a), which provides:

"If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony."

The testimony about the photograph of Taylor's body was based upon the witness' perception and helped the jury to understand

what the witness meant by "overdone." Hunt fails to establish that the district court abused its discretion by admitting the evidence.

## PROSECUTORIAL MISCONDUCT

Hunt raises a claim of prosecutorial misconduct, based upon the following statement made by the prosecutor in the rebuttal portion of closing arguments:

"Made a big deal of brothers. Well, brothers know him best. They were around him during this time. They saw his actions. You heard Pat Hunt say it was—I didn't think it initially, but the way he was acting, what he did, that's why they said that he did it."

Appellate review of an allegation of prosecutorial misconduct involves a two-step process. The appellate court first decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence, and, if so, the reviewing court decides whether those improper comments constitute plain error, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007). Obviously, if the comments do not exceed the bounds of fair argument, there is no need to proceed to the second step of assessing plain error.

Here, Hunt argues that the testimony of his brother, Patrick, as to his belief that Hunt had killed their mother was inadmissible. Specifically, Hunt points to *Steadman* as prohibiting personal opinions as to the guilt of the defendant and to K.S.A. 60-456(a) as limiting the opinion testimony of lay witnesses. Therefore, the argument continues, it was wrong for the prosecutor to highlight Patrick's testimony in closing argument.

Hunt's argument takes on the air of disingenuousness when one discovers that on direct examination the State did not inquire into Patrick's conversations with law enforcement. Rather, it was *defense counsel* that elicited the allegedly inadmissible testimony from Patrick on cross-examination by asking, "[D]id you tell Officer Adams that you suspected Paul Hunt was the person involved in the disappearance and murder of your mother?" See *State v. Hebert*, 277 Kan. 61, 78, 82 P.3d 470 (2004) (defendant may not invite error and then complain of it on appeal). Furthermore, the state-

ment of which Hunt complains was made in rebuttal, after defense counsel had argued in closing as follows:

"Pat Hunt who thinks the defendant is guilty can't think of a single time when Paul has been violent to somebody. . . .

. . . .

". . . What happens to Paul after the body is discovered? The Ransom Street address immediately becomes a crime scene. He can't stay there any more. The truck is part of the evidence of the crime scene. He loses that.

"Where does he have to go? The only place he has are his brothers. And yet before any of these discoveries that they show you are made, Pat Hunt goes on July 7 and tells the police you've got to arrest my brother, he killed my mother. Do you see why Paul went off [left town]?"

After the defense elicited the testimony from Patrick and then presented argument on the substance of Patrick's answers in its closing argument, the prosecutor's rather innocuous statement on rebuttal was certainly within the bounds of fair comment on the evidence. *Cf. State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001), *overruled on other grounds State v. Davis*, 283 Kan. 569, 575, 158 P.3d 317 (2007) (no prejudicial error where questionable remarks of prosecutor provoked or made in response to previous arguments or statements of defense counsel). We find no misconduct and need not consider the second step of the analysis.

## LIMITING INSTRUCTION ON PRIOR CRIME EVIDENCE

At trial, the State introduced the testimony of Hunt's son, Ryan, who described an argument between his father and Taylor over credit card bills, during which Hunt pushed Taylor. The State described the testimony as "discordant relationship evidence." On appeal, Hunt does not complain about the introduction of the testimony but contends that the failure to give the jury a limiting instruction constitutes reversible error. We disagree.

This case was tried prior to our decision in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). Nevertheless, we analyze the issue pursuant to the roadmap set forth in *Gunby*. See 282 Kan. at 59-63; *State v. Gonzalez*, 282 Kan. 73, 98, 145 P.3d 18 (2006); *State v. Anthony*, 282 Kan. 201, 214-15, 145 P.3d 1 (2006). Specifically, the failure to give a limiting instruction, where Hunt neither requested the instruction nor objected to its omission, is reviewed

under a clearly erroneous standard. " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]' *State v. Saenz*, 271 Kan. 339, 346, 22 P.3d 151 (2001)." *State v. Trotter*, 280 Kan. 800, 805, 127 P.3d 972 (2006).

Hunt contends that the evidence against him was not "truly overwhelming" and, therefore, a real possibility exists that the jury would have rendered a different verdict if the error had not occurred. However, rather than attempting to assess the quantity and quality of all of the evidence of guilt presented during the trial, a more useful approach is to focus on the potential impact of the specific evidence in question.

The testimony that Hunt pushed his mother during an argument at some point in the past was not overly prejudicial in light of the other evidence presented by Hunt's girlfriend and others, describing a bitterly contentious relationship between the defendant and victim. We are firmly convinced that the jury's verdict would not have been affected by an instruction that the jury could consider the evidence of the pushing incident for only a limited purpose.

## PROSECUTORIAL MISCONDUCT FOR A DOYLE VIOLATION

In the State's case-in-chief, Agent Papish testified that he interviewed Hunt in Pennsylvania, following Hunt's arrest. In the initial interview, Hunt said that he would tell the agent all that he knew about his mother's murder the next day. However, the next day, Hunt did not give a statement. On appeal, Hunt does not complain about Agent Papish's testimony but rather he challenges the prosecutor's cross-examination of his testimony. The exchange between the prosecutor and Hunt went as follows:

"Q. Do you recall speaking to Agent Papish out in Pennsylvania after you had been arrested?

"A. I remember some of it, yes.

"Q. And you told him—he asked you I want to talk about your mom's murder and you told him not once, not twice, but three to four times I will tell you everything you want to know about the murder of her in the morning. You told him that, didn't you?

"A. Meaning I would tell him everything I know in the morning, yes.

"Q. Did you tell Agent Papish everything you knew?

"A. After I asked for an attorney, he left me.

"THE COURT: Hold on just a second. Come forward, please.

"(The following proceedings were had at the bench.)

"MR. CLARK [defense counsel]: Judge, I think what he was looking for is the answer no, not the response—

"MR. BAUCH [prosecutor]: That's certainly—

"THE COURT: I understand. I'm not suggesting the State brought this out purposefully. I just wanted to ask you if we should not address that last response to the jury or should we just let it go.

"MR. BAUCH [prosecutor]: You didn't tell him everything you knew, did you, and that was the question.

"THE COURT: The question you asked was not inappropriate. And I did not expect the defendant to answer as he did and I don't think probably either one of you did but, should we, after that response to the jury, should I tell the jury to disregard the defendant's last response or should I let it slide.

"MR. CLARK [defense counsel]: I don't think you should mention it at this point.

"MR. BAUCH [prosecutor]: It hasn't happened so I think we will probably be okay, Your Honor.

"THE COURT: Just be very wary of this subject.

"MR. CLARK [defense counsel]: If you are going to reask it, could you basically say yes or no.

"MR. BAUCH [prosecutor]: I will ask for a yes or no response.

"THE COURT: Ask for a yes or no response. Thank you.

"(The following proceedings were had in the presence of the jury.)

"Q. (By Mr. Bauch) I would like a yes or no response to this question, Mr. Hunt. Did you tell Agent Papish everything you knew about the murder of Mary Sue Taylor?

"A. Can you repeat that?

"Q. Yes. Did you tell Agent Papish everything you knew about the murder of Mary Sue Taylor?

"A. Did I tell him that I—did I tell him that I would tell him?

"Q. I would like—did you tell Agent Papish everything you knew about the murder of your mother Mary Sue Taylor?

"A. What did you mean?

"Q. Did you tell him everything you knew about the murder of your mother Mary Sue Taylor, yes or no?

"A. There was nothing to tell."

Impeaching a defendant with his or her post-*Miranda* silence violates the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. *Doyle v. Ohio*, 426 U.S. 610,

619, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); *State v. Mims*, 220 Kan. 726, 729-30, 556 P.2d 387 (1976). In *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998), this court explained:

"A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent."

The prohibition applies even where the defendant invoked his or her rights after having initially spoken with law enforcement pursuant to a waiver. See *State v. DuMars*, 33 Kan. App. 2d 735, 748, 108 P.3d 448, *rev. denied* 280 Kan. 986 (2005).

However, appellate courts have typically declined to review an alleged *Doyle* violation where the defense fails to make a contemporaneous objection. See *State v. Sanchez*, 282 Kan. 307, 311, 144 P.3d 718 (2006); *State v. Fisher*, 222 Kan. 76, 84, 563 P.2d 1012 (1977). Hunt concedes that he did not object to the question, "Did you tell Agent Papish everything you knew?" Indeed, defense counsel's only concern was that his client be directed to provide a "yes or no" answer.

Accordingly, Hunt raises his *Doyle* violation complaint in the context of prosecutorial misconduct, *i.e.*, the prosecutor committed reversible misconduct by knowingly asking a question which the prosecutor knew was impermissible under *Doyle*. The obvious reason for such a characterization is that appellate courts will review a prosecutorial misconduct claim regardless of whether the defense objected at trial. See *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

Recently, we noted the potential conflict between cases declining to review a *Doyle* violation in the absence of a contemporaneous objection at trial and those considering the allegation without a trial objection when the appellant couched the issue as prosecutorial misconduct. *State v. Hernandez*, 284 Kan. 74, 79, 159 P.3d 950, *cert. denied* 128 S. Ct. 620 (2007). However, *Hernandez* found that defense counsel in that case had appropriately objected to the challenged questions, obviating any need to resolve the potential conflict. *Hernandez* then proceeded to analyze the question

on the same basis as it was raised on appeal, *i.e.*, as a claim of prosecutorial misconduct. But *cf. State v. Hazley*, 28 Kan. App. 2d 664, 667-69, 19 P.3d 800 (2001) (court refused to review claim that prosecutor committed misconduct in eliciting testimony in violation of *Doyle* where no contemporaneous objection but found a claimed *Doyle* violation in closing argument was reviewable as prosecutorial misconduct).

Similarly, we perceive that we need not directly address whether the distinctive review standard for prosecutorial misconduct provides a logical basis for reviewing a *Doyle* violation in that context, even though the absence of a contemporaneous objection might preclude reviewing the error on an evidentiary basis. "[T]he rationale underlying the contemporaneous objection rule is to permit the trial court to avert error by precluding improper evidence." *State v. Parker*, 277 Kan. 838, Syl. ¶ 2, 89 P.3d 622 (2004). Here, the trial judge recognized that the prosecutor's questioning had created a *Doyle* problem, albeit the court deemed the answer to be problematic, rather than the question. The court called counsel to the bench, where the matter was discussed, and the trial judge declared that the prosecutor's question "was not inappropriate." In other words, the district court was in a position to avert error and, in fact, ruled on the issue. *Cf. Parker*, 277 Kan. 838, Syl. ¶ 3 (where trial court granted a continuing objection to evidence excluded by order in limine, the trial court was in a position to avert error on account of introduction of objectionable evidence and rationale of contemporaneous objection rule met). We eschew a hypertechnical application of the contemporaneous objection rule that differentiates between a *sua sponte* court ruling and one that is prompted by an objection. The same opportunity to avert error exists under either scenario. Thus, we will proceed to review the claim as it has been raised on appeal, as a claim of prosecutorial misconduct.

The two-step prosecutorial misconduct analysis where the complaint involves the eliciting of testimony, rather than closing argument, involves an initial determination of whether the prosecutor's questions were impermissible. If so, the court must then determine whether the questions constituted plain error. See *State*

*v. Overton,* 279 Kan. 547, 558, 112 P.3d 224 (2005). In the second, plain error step, the appellate court considers three factors:

"(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California,* 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have been met. [Citations omitted.]" *Albright,* 283 Kan. at 428.

The trial court and the attorneys focused on Hunt's unexpected response and apparently failed to recognize that the question itself fit squarely within the proscription of *Doyle.* On appeal, the State continues to focus on Hunt's statement that he asked for an attorney as being the only impropriety. However, the question, "Did you tell Agent Papish everything you knew?" on its face "attempts to impeach [Hunt's] credibility at trial by arguing or by introducing evidence that [Hunt] did not avail himself . . . of the first opportunity to clear his or her name when confronted by police officers." See *Edwards,* 264 Kan. at 195. Even in context, the question suggested that Hunt knew something about the murder that he failed to share with Agent Papish and that the jury should discount Hunt's trial testimony because of the unfavorable inference to be drawn from that silence. Regardless of the prosecutor's motive in propounding the question, it denigrated Hunt's exercise of his constitutional right to remain silent and was a *Doyle* violation.

Nevertheless, in this case, the improper question of which Hunt complains does not constitute plain error, requiring reversal. We perceive the most harmful evidence was Agent Papish's description of the initial interview with Hunt, in which Hunt said several times that he would talk with the agent the next morning about what happened to his mother. The inference to be drawn from that testimony was that Hunt possessed personal information about the murder. In comparison, the fact that Hunt did not carry through with his promise to talk about the murder is rather harmless. Es-

pecially, in light of Hunt's ultimate answer, "There was nothing to tell."

On appeal, Hunt emphasizes the third factor of the second step of the plain error analysis, arguing that the evidence was not of such a direct and overwhelming nature as to render the misconduct unlikely to have had little weight in the jurors' minds. The point that the evidence in this case was not direct and overwhelming is well taken. However, we look at all of the factors and assess the impact on the jury's decision. Here, we do not consider the misconduct to be gross and flagrant, especially given the prior testimony of Agent Papish, which the defense allowed to come in unchallenged. Further, we would be hard-pressed to say that the prosecutor displayed ill will in propounding a question which both defense counsel and the trial judge believed to be an appropriate inquiry at the time. Accordingly, we find that reversal is not required.

## CUMULATIVE ERROR

Finally, Hunt contends that, even if we find that none of the individual trial errors, standing alone, requires reversal, the cumulative effect of all of the errors mandates that he have a new trial. Our standard for analyzing cumulative error is often stated as:

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]" *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 (2006).

Frequently, claims of cumulative error are quickly disposed of by declaring the evidence against the defendant to be overwhelming or by pointing out that the court has found no more than one error. See *State v. Anthony*, 282 Kan. 201, 217, 145 P.3d 1 (2006) (one error insufficient to support reversal under cumulative effect rule). Neither tack is applicable here. We have noted two errors in instructing the jury and an instance of prosecutorial misconduct.

Likewise, by any measure, the State's evidence in this case was not of a direct and overwhelming nature.

Nevertheless, our standard is to view the proceedings from a global perspective and assess whether the defendant received a fair trial. In doing so, we can look at how the individual errors intertwined with each other, how they impacted the theory of defense, and whether they gave the State an unfair advantage. Here, the error in the murder elements instruction was effected with the advice and consent of defense counsel, akin to invited error. Likewise, defense counsel apparently believed that the prosecutor's cross-examination question was appropriate, urging that it be re-asked as a "yes or no" question. Moreover, the K.S.A. 60-455 evidence for which a limiting instruction was not given was cumulative and not particularly critical to the State's case or Hunt's defense. In short, although this is a closer case than most, we are comfortable in assessing that, under the totality of the circumstances, Hunt received a fair trial, albeit perhaps an imperfect one.

Affirmed.

DAVIS, J., not participating

McANANY, J., assigned