NOT DESIGNATED FOR PUBLICATION

No. 118,409

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FRANCISCO MORENO,
*Appellant*.


MEMORANDUM OPINION

Appeal from Finney District Court; WENDEL W. WURST, judge. Opinion filed June 7, 2019. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Tamara S. Hicks*, assistant county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., BRUNS, J., and BURGESS, S.J.


PER CURIAM:  Francisco Moreno appeals after a Finney County jury convicted him of six total crimes, four of which are relevant to his appeal:  (1) attempted voluntary manslaughter of a gestational infant, occurring near the Finney and Kearny County boundary; (2) attempted second-degree murder of Lisette Dominguez, occurring near the Finney and Kearny County boundary; (3) aggravated kidnapping, occurring in Finney County; and (4) intimidation of a victim, occurring in Finney County. Moreno claims that venue was improper for the attempted manslaughter and attempted murder charges in Finney County and that the evidence was insufficient to prove he had committed

1

aggravated kidnapping and intimidation of a victim. Venue was proper in Finney County, and there was sufficient evidence that supported each of Moreno's convictions. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Moreno was stopped while driving his vehicle on October 9, 2016, by an officer of the Finney County Sheriff's Office after his mother called to report a domestic violence situation between Moreno and Dominguez, his pregnant girlfriend. Moreno was subsequently arrested and charged with a litany of crimes, all charged as having occurred in Finney County, including two counts of aggravated kidnapping, two counts of aggravated battery, one count of aggravated endangering a child, and one count of criminal threat.

Before trial, the State amended the complaint to add charges for more crimes allegedly committed against Dominguez, including two counts of attempted first-degree murder, two counts of aggravated intimidation of a witness or victim, and two counts of violation of a protective order. The State also added one count of aggravated assault and one count of criminal threat, all allegedly committed against another individual, Evan McClure, who was also involved in the incident that led to Moreno's arrest.

At the preliminary hearing, the State dismissed the charges involving McClure because it was unable to subpoena him to testify. At the close of the preliminary hearing the State argued: (1) that it believed the acts leading to Moreno's charges originated and finished in Finney County; and (2) that the majority of the actions took place in Finney County, but some events may have taken place in Kearny County. As a result, the State believed that venue was proper in Finney County based on the underlying caselaw for acts occurring in multiple counties or acts occurring on or near the border between two counties. The trial court bound Moreno over on the remaining charges, other than

2

aggravated endangering a child charge since Moreno was bound over on the attempted first-degree murder charge against the unborn child. The trial court also directed the State to file a second amended complaint reducing one of the aggravated intimidation of a witness or victim charges to intimidation of a witness. Moreno pleaded not guilty to the charges.

Testimony in the jury trial began on April 24, 2017. Over the next 5 days, the State presented the testimony of 23 total witnesses, consisting of law enforcement, medical personnel, Dominguez, and family members of both Moreno and Dominguez. Because the issues on appeal mainly deal with whether the particular location of the events had been proven, many of the underlying facts of this case are unnecessary to analyze these issues. The following is a general description of the underlying events, and a more detailed description of the geographical locations of events will be discussed where appropriate.

*The State's presentation of evidence*

Maria Lopez, Moreno's mother, called 911 on October 9, 2016, and requested an ambulance be dispatched to her trailer. Moreno woke Lopez up that morning and told her to look at what had happened to Dominguez, who was "all bloody" and whose face "was in bad shape" because "[i]t had been beaten," presumably by Moreno. According to Lopez, Moreno did not know she called the police, but he and Dominguez left in his vehicle before the ambulance arrived.

Jerry Hahn, a patrol corporal with the Finney County Sheriff's Office, responded to the 911 call. Officer Hahn proceeded to stop Moreno's vehicle two blocks from Lopez' trailer and made contact with the driver, later identified as Moreno. As the officer was walking toward the vehicle, he could hear Moreno inside the vehicle yelling something at the female passenger, later identified as Dominguez.

3

Officer Mariano Muniz, a patrol deputy with the Finney County Sheriff's Office, also responded to the 911 call and arrived shortly after Officer Hahn had stopped the vehicle. Officer Muniz got out of his patrol car and approached the vehicle from the passenger side. Inside the vehicle, he could see a male subject, who Officer Muniz knew to be Moreno, and a female passenger. Officer Hahn asked Moreno to exit the vehicle and he complied. Officer Muniz patted Moreno down for officer safety.

Another Finney County patrol deputy, Jared Mindrup, arrived to assist with the vehicle stop. Officer Mindrup testified Moreno seemed agitated and kept trying to turn and yell something to Dominguez, but the officer could not recall what Moreno yelled. As Officer Muniz was arresting Moreno, Moreno asked, "How can you arrest me if she didn't say I did it?" Shortly after being placed under arrest, Moreno began yelling toward Dominguez not to tell the officers anything. Officer Mindrup removed Moreno from the scene, then the officers went to assist Dominguez.

Officer Hahn testified that he noticed "several injuries to [Dominguez'] face and arms," and "there was obvious swelling and misshaping to the structure of her face." Dominguez was upset and crying but could speak and told Officer Hahn she was pregnant. Officer Hahn radioed this information to EMS—the ambulance paramedics.

Officer Muniz testified that while they waited for an ambulance to arrive Dominguez did not appear to want to talk. Officer Muniz took photographs of the vehicle's interior, as well as Dominguez' injuries. The officer also took photographs of her injuries later at the hospital. These photographs were then admitted as evidence at trial. A couple of the photos depicted the interior of the vehicle and showed what Officer Muniz believed to be "blood and hair . . . matter that was in the center console." Dominguez agreed that the hair and blood on center console could have been hers. On cross-examination, Officer Muniz testified he believed the hair and blood on the center console came from Dominguez but that he had not analyzed it. Officer Muniz identified

4

one of the photos as depicting Dominguez as she appeared sitting in the passenger seat and said he initially believed she was dead. Officer Muniz also identified a picture depicting a "very deep cut" on Dominguez' finger that looked like it was "almost severed and cut off."

Jeff Steele, the investigating detective with the Finney County Sheriff's Office, obtained and executed a search warrant on Moreno's vehicle. The vehicle was towed to secure it as evidence. Detective Steele took photographs of the interior of the vehicle, which he believed depicted blood in various locations throughout the interior, including the back driver's side door, the passenger side rear door, the backseat, and the floorboard. Detective Steele also collected a Phillips-head screwdriver, a white hand towel that appeared to have blood on it, and various items of clothing to be submitted as evidence.

James Good, a paramedic who responded to the 911 call, testified that he assisted Dominguez, who was complaining of pain and had "obvious swelling to [her] face, arms, and hands." Good testified Dominguez had to be "dead lifted" out of the vehicle by the paramedics and onto the gurney because Dominguez was in so much pain and was unable to stand up by herself. On cross-examination Good testified Dominguez pointed to her crotch when asked if she could step out of the vehicle, but he could not see any signs of trauma to that area when assessing her injuries.

Joshua Hartman, the emergency room doctor at St. Catherine's Hospital in Finney County, and Michael Simon, the emergency room nurse assessing Dominguez, testified that upon her arrival, they immediately noticed the swelling and bruising of her face and the lacerations to her hands, but they were also concerned with any possible internal brain or spinal injuries, as well as the fact that she was around 26 to 28 weeks pregnant.

Simon testified Dominguez told him that her significant other took her into the country and accused her of sleeping with several people. He stated Dominguez told him

5

Moreno had beaten her while "telling her this was the place she was going to die if she didn't admit to sleeping with several people." Dominguez also told Simon that "she admitted to it because she wanted [the beating] to stop, and then he beat her some more. And when they came back into town to Deerfield to get gas [she] was told to cover up her face because there were people there."

Doctor Hartman testified Dominguez complained of abdominal pain and had contractions every six minutes. Doctor Hartman also testified he ordered a CT scan of not only Dominguez' brain, but also her face and cervical spine. The CT scan showed a subdural hematoma, just outside the brain. The decision was made to transfer her to Wesley Medical Center in Wichita due to St. Catherine's lack of a neurosurgeon and its inability to care for a premature baby if Dominguez had given birth.

Before Dominguez left St. Catherine's Hospital, Officer Muniz spoke with her, as well as her mother, Raquel Elizalde; Dominguez' friend, Lilibeth Hernandez; and Dominguez' aunt, Melissa Huerta. The officer explained to Elizalde that Dominguez was unwilling to speak with him regarding what had happened. When Officer Muniz returned to the hospital that afternoon, Dominguez provided some details regarding what had happened to her.

Officer Muniz testified Dominguez told him that Moreno left her mother's house the previous day because "'[n]obody in her family likes him.'" He returned around 3 a.m. the next day to pick her up. They drove to his mother's trailer and an argument ensued. Moreno stopped the vehicle and she got out. Moreno followed her and was yelling at her. Dominguez was not sure where the vehicle had stopped, but she knew that it was one of the trailer parks in the area. She walked to a trailer, tried to open the front door, and began to yell for help. Moreno then grabbed her hair and dragged her back to the vehicle.

6

Dominguez told Officer Muniz she hit Moreno with a bottle at that time. Moreno then forced her into the vehicle and told her he was going to drive her to a field and beat her. They drove for a while and ended up in an unknown field. Moreno was accusing her of sleeping with his uncle and brother. He began beating her and would not stop until she told him what he wanted to hear. Dominguez said in the process she was cut by a screwdriver but did not know exactly how it occurred. Dominguez did not know where this occurred because it was dark, but that they drove out of the field and ended up at a store in Deerfield, where the vehicle broke down and they received assistance. After the employees at the store helped them, Moreno and Dominguez drove back to his mother's trailer in Garden City. Lopez called the sheriff's office and an ambulance. Moreno told Lopez that he was going to take Dominguez to the hospital. Dominguez stated she did not want Moreno to take her to the hospital, but he picked her up and put her back in the vehicle. They began to drive away, and law enforcement stopped them shortly thereafter.

Elizalde testified she first learned her daughter was in the hospital when Lopez came to her trailer that morning around 10 a.m. and told her, "Francisco almost killed your daughter." When Elizalde arrived at the hospital Dominguez said, "Look at my hands. I was protecting me and my baby. He wanted to kill us."

Hernandez testified when she first arrived at St. Catherine's Hospital Dominguez "said something like, I told you I needed help." Dominguez said Moreno got a screwdriver and stabbed her with it stating, "I'm going to kill you and that baby, and kicked her in the vagina."

Officer Muniz returned to the hospital and spoke to Dominguez. Hernandez, Elizalde, and Huerta  were also present during this conversation. Dominguez stated that Moreno accused her of being with McClure and Moreno was very mad. Moreno told Dominguez and McClure he was going to beat them both, and McClure ran away. Moreno then told Dominguez he was going to kill her and the baby.

7

On cross-examination, Huerta admitted that she omitted some details from her written statement because Dominguez had already told Officer Muniz that information. Huerta remembered Dominguez telling Officer Muniz that she left with Moreno and they drove until he pulled over and tried to fight McClure. Dominguez tried to escape and managed to get out of the car, then tried to enter someone's trailer, but Moreno pulled her by the hair and injured her finger in the process. Huerta specifically remembered Dominguez telling Officer Muniz that the finger injury occurred at the trailer park, and not by the field. On redirect, Huerta clarified that Dominguez told her the finger injury happened when she was opening the door of a trailer and Moreno pulled her by the hair.

Bruce Thomas, a level one trauma surgeon at Wesley Medical Center treated Dominguez and testified the trauma team found no internal bleeding, but that the fractures to her face and nose required consultation with a face surgeon and she was admitted to Wesley to monitor her baby's health. On cross-examination, he explained that because of her injuries, they were concerned Dominguez could have gone into labor and wanted her at Wesley because that hospital was equipped to handle a premature birth.

Megan Meier, a registered forensic nurse at Wesley Medical Center, completed a forensic examination of Dominguez. Dominguez gave Meier a detailed accounting of the timeline of events stating that Moreno picked her up around 3:30 a.m. on October 9, 2016. They drove to the trailer park where his mom lived, and he got into the backseat and began punching and kicking her. Moreno grabbed her head and banged it against the door. Dominguez tried to get away but the child locks on the backdoor prevented her from escaping, so she hit him in the head with a beer bottle. Dominguez then climbed into the front seat, opened the door, and started running. She saw a trailer and began knocking on the door. The door was open but before Dominguez could enter, Moreno pulled her down the stairs by her hair. She fell down and Moreno told her she had five seconds to get up, but she was hurting and unable to stand on her own. Moreno put Dominguez in the car and began driving.

8

Meier said that Dominguez told her Moreno eventually pulled over and began hitting and kicking her again. Moreno asked her if she had ever messed around and kept hitting her. Dominguez told him what he wanted to hear. Moreno told her he would kick her in the stomach and he did not care. He helped her back to the car and started hitting her again. Sometime while she was in the car, Moreno stabbed Dominguez in the left hand with a Phillips-head screwdriver in two locations. Moreno began accusing her of sleeping with other people and hitting her. He finally stopped when the sun came up. Moreno asked Dominguez if she knew how to get home because they were in Deerfield, and they stopped at a gas station. When they arrived back at Lopez' trailer Moreno told his mother that he did this to Dominguez because she was sleeping with his mother's boyfriend. Lopez called the police, and Moreno said he had to leave because he did not want to go to jail. Dominguez said, "'His mom tried to stop him, but he wouldn't listen. By the time we got out of the trailer park and turned the corner, the cop was already there.'" Moreno told the police, "'I got beat up at a party.'"

Meier testified that she put as much of what Dominguez said in quotes as possible and that Dominguez was visibly upset and crying when relaying the history of what had happened. Meier took photographs of "every injury [she] could visibly see that [she] could possibly take of the patient without causing further harm to either her or . . . put[ting] the fetus in distress . . . ." Meier used the photographs to complete a body diagram of Dominguez' injuries. The body diagram was shown to the jury, and Meier described specific injuries, including:

- "redness and bruising on scalp under hair with an abrasion,"
- "abrasions around her mouth and the bruising . . . on her tongue,"
- "her hands where she had some lacerations . . . and a puncture mark on her left hand and some bruising," and
- "scratches and a bruise on her abdominal area [of] multiple and various lengths, and also . . . low abdominal and pubic tenderness upon walking."

9

Meier testified it took about an hour and half to photograph all of Dominguez' injuries. The trial court admitted the photographs Meier took of Dominguez' injuries, over Moreno's objection that they were unduly gruesome and duplicative. In particular, Meier described one picture as depicting an injury to Dominguez scalp area where it appeared that hair was missing. Meier said that after taking the photos, Dominguez asked her to help clean the blood from her hair. On cross-examination, Meier explained that she relied on Dominguez' history and her account of the events to document and look for specific injuries. She said "if [Dominguez] wouldn't have told me her hair was pulled, I wouldn't . . . have necessarily dug through her hair to look for, you know, any injuries."

Detective Steele and Officer Muniz spoke with Dominguez again at her mother's trailer after she had been discharged from Wesley Medical Center. In addition to what she told Officer Muniz at the hospital, Dominguez also stated that after McClure ran away from the car, before she fled to a nearby trailer, Moreno got into the backseat of the car, and began hitting and kicking Dominguez, and slammed her head against the rear driver's side door. Moreno then got back into the front seat to begin driving. She found a beer bottle and tried to open the back doors but they would not open because the child locks were on.

Dominguez climbed into the front seat and tried hitting Moreno with the beer bottle so she could escape from the vehicle and run. She got out and took off running toward a trailer. Dominguez opened the door, but Moreno was right there and grabbed her and pulled her back. Dominguez said she was unable to stand up and Moreno picked her up and put her back in the vehicle. Moreno told Dominguez he was going to take her to a field and "beat her ass." Moreno began driving, but Dominguez could not tell Detective Steele which direction because she did not have her glasses on. Moreno stopped by a field and began hitting, kicking, and punching her again inside the car. Moreno told Dominguez to get out of the car, which she did but could not remember how, and he began hitting and kicking her and slamming her head into the ground.

10

Detective Steele testified Dominguez then advised him that Moreno told her to get back in the car, but she stood up and then fell down. Moreno told Dominguez she had to the count of five or he would kick her in the face again. After she got back in the car, Moreno then began going through her phone and accusing her of having sex with other men, including his brother. She told him she had not, and then he hit her. Moreno continued asking her about sleeping with his brother and other people and then hitting her. Dominguez felt she had to answer in a certain way to avoid being hit again. Eventually the sun was out, and they left the field and ended up in Deerfield. Dominguez told Detective Steele that on the drive to his mother's trailer in Garden City, she told Moreno she wanted to go to her mother's trailer instead. Moreno said he would not let her go back there until she was healed.

Detective Steele also testified regarding a video call that took place while Moreno was in jail awaiting trial. Moreno and Melinda Perez, one of Dominguez' friends, engaged in a video call where Dominguez was present. Dominguez testified that she was present during the video call, but that she did not personally have contact with Moreno during the call. During the video call, Moreno never addressed Dominguez by name but asked Perez to tell Dominguez that he loved her. Moreno also stated "that the only help he can get is if one witness against him doesn't show up" to testify at trial. The trial court admitted a redacted copy of the video call at the State's request.

*Dominguez' testimony at trial*

During Dominguez' testimony at trial, the trial court permitted the State to treat Dominguez as a hostile witness. The trial court found that she was being evasive. Her testimony at trial varied from her testimony at the preliminary hearing.

Dominguez testified that the events leading to Moreno's arrest began the day before when Moreno dropped her off at her mother's trailer in Garden City to attend a

11

family function around 3 p.m. Dominguez expected Moreno to attend as well, but he decided to drop her off and leave. Eventually, he returned in his car with a friend, McClure, to pick up Dominguez at her mother's residence around 3 a.m. Dominguez got in the backseat and Moreno began to drive; Dominguez assumed they were driving McClure home or back to Lopez' trailer. At some point, the car stopped at a trailer park but Dominguez did not know exactly where they were. Moreno and McClure exited the vehicle, and then Moreno got back into the vehicle. Dominguez was not "paying attention" to where McClure went.

Dominguez stated they then drove around the same trailer park. Dominguez could not remember if Moreno had hit her, but she climbed into the front seat, opened the door, and got out. Dominguez said that she could not remember her previous testimony at the preliminary hearing that after McClure left the vehicle, Moreno got into the backseat with her, they started arguing, and the argument turned "physical." Dominguez started walking toward a trailer but could not remember which trailer it was. She reached the trailer and tried to open the door, not knowing who owned the trailer. Moreno then talked her into going back to the car, and they left.

Dominguez testified she could not remember testifying at the preliminary hearing that Moreno carried her back to the car, but she said she went voluntarily. On cross-examination, she said she believed Moreno grabbed her hair but that it caused no injury at that time. Dominguez said on further cross-examination that upon returning to the vehicle, she hit Moreno in the head with a bottle. They then began driving. Dominguez testified Moreno "maybe" said that he was going to take her to a field and beat her ass.

On cross-examination, Dominguez also testified that after leaving the trailer park, Moreno drove his car on all dirt or gravel roads in the country. Moreno eventually pulled over to the side of the road next to a field. Moreno and Dominguez were arguing about being unfaithful, and she told Moreno she probably had slept with his brother.

12

Dominguez acknowledged that she testified at the preliminary hearing that they were arguing because Moreno was accusing Dominguez of cheating on him, but Dominguez believed that argument occurred after they had driven to the field. Dominguez testified that the field was where Moreno first struck her and where "most, if not all" of the physical beating took place. She testified the reason they were fighting was that Moreno was accusing her of sleeping with various people and wanted her to admit that she was sleeping with those people. When she did not answer the way he wanted, he would hit, kick, or punch her.

Dominguez had marks all over her face, back, shoulders, legs, and ankles from where Moreno had hit her. She testified she "could have" told people Moreno kicked her in the vagina and that Moreno said he was going to kill her and her baby. On cross-examination, Dominguez denied that Moreno had ever said he was going to kill her and the baby, but that he could have killed her and the baby if he wanted to.

Dominguez stated that she remembered testifying at the preliminary hearing Moreno hit and kicked her outside in the field and that she tried to get up and fell down. Dominguez stated they were also fighting over a screwdriver at some point inside the car, but that the screwdriver did not cut her finger. During the preliminary hearing, Dominguez testified that the screwdriver struck her hand and caused it to bleed.

Dominguez also testified she did not believe Moreno stabbed her finger with the screwdriver. She said there were times in the field when he was holding her by the hair and pounding her face into the ground. Dominguez could not lay flat on her stomach because she was pregnant, and she covered her stomach with her arms to protect her baby.

Dominguez testified she did not know how long they were in the field, but it was dark outside when they arrived and light outside when they left. She believed they drove

13

west when they left the field but could not remember if they were driving toward or away from the sun. Dominguez said it was "maybe like a five-minute drive" from the field to the gas station. Moreno's car would not start at the gas station. Dominguez did not remember how long they were at the gas station, but she remained in the car the entire time and had covered her face and body with a towel. Moreno had told her to clean herself up at the gas station because her face looked like a pumpkin.

Dominguez testified that while she was being treated at the hospital, she was having contractions, and the doctors decided to send her to a hospital in Wichita. Dominguez could not remember why they told her she had to go to Wichita. She also could not remember making statements to the doctor and nurse while at the St. Catherine's Hospital in Garden City.

Dominguez also said she was not testifying in a certain way because she was afraid of Moreno or because she was in love with him and wanted to stay together. Dominguez agreed there was nothing keeping her from telling the truth while testifying, but she said that "[her] memory in general" may have caused her to either embellish or change words when talking to detectives or other witnesses. On redirect, Dominguez testified she had broken up with Moreno six or seven months before the trial but that her recently deleted Facebook page had reflected they were still together and would continue being together. Dominguez also testified that while at the hospital, somebody asked her if she wanted the blood out of her hair.

*Moreno's Presentation of Evidence*

On the fifth day of the trial, Moreno presented testimony of one witness, as well as testifying himself. Perez testified that she saw Moreno at a bar and a house party the night of October 8, 2016. They talked and Perez noticed that Moreno was high from taking Xanax pills and drinking.

14

Moreno then testified, stating that on the morning of October 8, 2016, he was at his mother's trailer with Dominguez and her children. He took Dominguez to her mother's house for a family get-together around 3 p.m., but did not want to go himself. Moreno told Dominguez he would return after taking a shower, but he did not return at 5 p.m. as he had promised. He went to a tattoo parlor, bars, and a house party before returning with McClure to pick up Dominguez. Dominguez got in the backseat and they began to drive away. While driving to his mother's trailer, where he and Dominguez were living at the time, Moreno began to question whether Dominguez had been cheating on him with McClure. Moreno stopped the car right near the entrance to the Wagon Wheel Trailer Park to fight with McClure, who took a swing at Moreno and then ran away.

Moreno testified that after McClure ran away, he got back into the car with Dominguez and asked if she and McClure had been messing around with each other. She climbed into the front seat of the car, and they continued to drive to his mother's trailer; meanwhile, Moreno was calmly asking Dominguez about McClure. Dominguez then hit Moreno with a bottle, got out of the car, and walked away toward a yellow trailer near the one owned by Moreno's mother. Moreno followed her, and once he caught up to her at the door of the trailer, he grabbed her by the shirt and they got back in the car together. Moreno drove and Dominguez rode silently in the backseat of the car until they reached the field. According to Moreno, he drove the car away from the trailer park toward VFW Road and then took a right to drive toward the highway.

The following line of questioning between Moreno and his defense counsel occurred:

"Q. Where did the two of you drive to?
"A. We drove all the way up to the highway.
"Q. You're talking about the bypass?

15

"A. Boy, I drove up to the highway over here off of, you know, VFW Road ends and there is a highway right there.

"Q. Okay. What did you do then?

"A. I took a left on that highway.

"Q. And where does that highway go?

"A. It goes towards, I guess, you could say Syracuse, that—

"Q. You're talking about the big highway?

"A. The big highway, yes.

. . . .

"Q. Where did you drive to then?

"A. I drove towards the bypass.

"Q. Okay. And at any point did you get on the bypass?

"A. I did get on the bypass.

. . . .

"Q. Where did you go on the bypass?

"A. I took a right on the bypass.

"Q. Where to?

"A. Well, the bypass—the bypass—okay, either you take a left and you go towards Holcomb or Tyson, or you take a right and just go up toward—on the gravel road going up.

"Q. So you didn't get on the actual highway, you went over it, north of the bypass?

"A. Yeah.

"Q. Where were you going?

"A. I wasn't planning on going anywhere. I was just thinking.

. . . .

"Q. Where did the two of you drive, then?

"A. Well, I hit the first road, and I was going to take a U-turn, but when I turned—when I took a left, I brought up the subject, and when she said something slick, so I just kept driving.

"Q. And so at this point you had gone north of the highway and now you turned left on a dirt road?

"A. Yes, I did.

"Q. Any idea where you were at that time?

"A. I just remember being on a gravel road.

16

. . . .

"Q. How long did you drive?

"A. I don't even remember.

"Q. And this was all gravel roads?

"A. Yes, it was."

Moreno testified that once arriving at the field, he asked Dominguez if she had slept with his brother, to which she said she had. Moreno was angry and stopped the car, then got into the backseat and began hitting Dominguez in the face with a closed fist, causing her to begin bleeding. He continued hitting her in the face and other parts of her body, including her hands and arms as she was using them to block his punches. Moreno opened the door to the car and kicked her out and onto the ground. Dominguez laid on her side and used her hands and arms to block her stomach to protect her unborn baby. He continued hitting and kicking her on the shoulders and back, yelling out names of men he thought she had slept with. While Dominguez believed that she had to agree she had slept with these men to get Moreno to stop hitting her, Moreno said the beating would have been worse if she had admitted to sleeping with more men. Moreno kicked her in the face at least once and threatened to do so again.

Eventually, Moreno stopped beating Dominguez and put her back into the car. His car was facing away from the sun, which had just started to rise. He drove west for a few seconds before running into a ditch, then he turned the car around and drove past the spot where the beating occurred and turned right on the next road. From there, Moreno said he drove south on that same road until he hit the highway, before eventually ending up at the Country Corner gas station in Deerfield. Moreno's car stalled on the highway, so he pushed it into the parking lot to park at the gas pumps.

After purchasing gas at the Country Corner and receiving assistance from the employees there to fix his stalled car, Moreno said he and Dominguez returned to his mother's trailer in Garden City. After his mother called the police, Moreno and

17

Dominguez got back in the car and drove away. Shortly after leaving the trailer park, the car was stopped by officers from the Finney County Sheriff's Office.

*Amending the complaint*

On the first day of trial, before beginning jury selection, the trial court discussed the parties' proposed jury instructions, and the State asked the court to review *State v. Rivera*, 42 Kan. App. 2d 1005, 219 P.3d 1231 (2009), because it "really applie[d] to our case." According to the State:

> "[*Rivera*] talks about instructing the jurors on the fact that the crime may have occurred in a neighboring county as well as Finney County, so we will be asking the Court to review that case. So as we don't know exactly where some of the things in the county happened."

The trial court requested that the State provide it with a proposed jury instruction on the issue by the third day of trial. Moreno explained to the jury in his opening statement that the evidence would show that the relevant actions all happened within Kearny County. On the third day of trial, the parties discussed their proposed instructions with the trial court, with the State requesting to include that events leading to the charges "occurred in Finney or Kearny County" on several of the charged crimes, and the State mentioned that an instruction might also be needed for a different statutory venue exception for when different elements of a crime occur in different counties.

On the fourth day of trial, and before presenting evidence, the State explained that it intended to amend some charges to encompass both Finney and Kearny Counties despite not having presented any evidence that any elements of the crimes occurred outside Finney County. When the trial court asked why it would "instruct on one act in one county and one act in another," the State admitted that the reason for the requested change was "[b]ecause we don't know for sure where the field is [located]." The trial

18

court reminded the State that it has a burden of proving venue and that it would need to file an amended complaint before resting its case.

Later that day, after presenting evidence, the State moved to amend the complaint for some of the charges to encompass both Finney and Kearny Counties. Moreno objected to the amendment, arguing that the State had ample time since the preliminary hearing to amend the complaint in this way. He contended that allowing the amendment would prejudice his defense because the area would now be "much broader." Moreno also argued that the evidence presented showed that the beating happened in or around Deerfield, entirely within Kearny County, and "absolutely no proof [was] given that [the beating occurred in] Finney County."

The trial court reminded Moreno that before jury selection and on the morning of the second day of trial, the State had indicated it would be submitting instructions with a dual county element. The trial court allowed the dual county amendments, finding that the amendments conformed to the evidence and that Moreno's substantial rights were not prejudiced by the amendments.

After the State rested, Moreno moved for a judgment of acquittal. While reviewing the charges, the trial court instructed the State that it needed to elect the evidence supporting each charge. The State argued that evidence of the beating in the field was sufficient to establish the attempted murder charges. The trial court denied the motion to acquit on the attempted murder charges. The State argued that evidence of a finger injury or hair being pulled out was the "bodily harm necessary for the aggravated kidnapping in that count" and that the testimony showed the aggravated kidnapping occurred solely in Finney County. The trial judge denied the motion to acquit on the aggravated kidnapping charge, finding that "physical harm that occurred in the course of the taking supports the bodily harm element . . . but I think . . . there is evidence of bodily harm exclusive of . . . the beating in the cornfield." Because the complaint had the dual county element on the

19

aggravated kidnapping charge at that time, the trial court advised that the State would still need to convince the jury that any bodily harm occurred near the Finney and Kearny county line. After dismissing four of the charges based on the motion for judgment of acquittal, the trial court instructed the State to file a fourth amended complaint with the seven remaining charges.

At the close of Moreno's presentation of evidence, Moreno renewed his motion for judgment of acquittal on all charges. Moreno mainly argued that the trial court should acquit him of the two counts of attempted murder, aggravated kidnapping, and aggravated battery because the State had failed to show that any acts occurred "on or so near" the Finney and Kearny county line to not be readily determinable to support the dual county element for those charges. Moreno argued that the evidence showed the beating in the field took place west of Deerfield—within Kearny County.

The State explained that the evidence supporting the aggravated battery charge occurred in a trailer park in Finney County, Moreno had gotten into the car and kicked, hit, and smashed Dominguez' head into the car door. The trial court denied the motion for acquittal on the aggravated battery, and it said that it would hold the State to this election that the aggravated battery occurred only in Finney County.

As to the attempted murder charges and the aggravated kidnapping charge, the State argued that there was evidence to show that Moreno and Dominguez ended up in Deerfield, but that "no one knows particularly an exact location where that field [where the beating took place] was, but we do believe that it was close to the line between Kearny and Finney line." The trial court denied the motion for acquittal for these charges, finding that no "definitive determination as to exactly where the car stopped on the side of the road" could be established based on the evidence.

20

Later, when discussing a proposed multiple acts instruction that the State requested, the State went through its elections to support each charge. The State said for the attempted murder charges, the beating in the field supported those charges. As to the aggravated kidnapping charge, the State argued that the bodily harm element could be established by evidence that while the vehicle was stopped outside the Wagon Wheel Trailer Park, Moreno had grabbed Dominguez, pulled her by the hair, and dragged her down the stairs of the trailer, causing her to fall down. The trial court clarified that this meant the aggravated kidnapping would have taken place in Finney County only, and the State agreed.

The trial court instructed the jury on the charges, with only the attempted murder charges including the dual county language. The instructions also included a multiple acts instruction for the attempted murder charges and the aggravated kidnapping charge. After around four hours of deliberation, the jury returned verdicts finding Moreno guilty on all six counts: attempted voluntary manslaughter, attempted second-degree murder, aggravated kidnapping, aggravated battery, intimidation of a victim, and criminal threat.

Before sentencing, Moreno moved to arrest judgment and for new trial, arguing that by allowing the State to amend the complaint several times and to elect a specific act on the aggravated kidnapping charge prejudiced him. At the sentencing hearing, Moreno also argued that allowing the State to "hedge its bets" by including the dual county language in its amended complaint failed jurisdictionally because the amended complaint did not state one particular location with specificity. Ultimately, the trial court denied the motion to arrest judgment because there was a "legitimate question for the jury" regarding where the acts supporting the attempted murder charges occurred and because the State had elected to pursue the argument that the aggravated kidnapping occurred only in Finney County.

The trial court sentenced Moreno to 640 months in prison consecutive to an additional 180 days in county jail. Moreno filed a timely notice of appeal.

DID THE TRIAL COURT LACK VENUE TO PROSECUTE
MORENO FOR THE TWO ATTEMPTED MURDER CHARGES?

On appeal, Moreno raises two arguments relating to venue: (1) The trial court abused its discretion when it allowed the State to amend the complaint for the attempted murder charges to allege they occurred at or near the boundary of two counties; and (2) the trial court lacked venue to prosecute Moreno for the attempted murder charges because the State failed to prove that venue was proper and jurisdiction existed.

The State disputes that allowing the amended complaint was an abuse of discretion by arguing that it had "considerable latitude" to amend a complaint to "more accurately meet the evidence presented at trial." Further, the State contends that venue was proper because the evidence presented before the amendment did not establish a clear understanding of the location of the field, so the circumstances met the statutory exception in K.S.A. 22-2604.

*Amendment of the Complaint*

The State generally has wide discretion to amend a complaint. See *State v. Woods*, 250 Kan. 109, 115, 825 P.2d 514 (1992). Under K.S.A. 22-3201(e), the State may also amend a complaint at any time before a verdict so long as it does not charge an additional or different crime and the defendant's substantial rights are not prejudiced. The State may amend the complaint at the close of its presentation of evidence to conform to the evidence. See *State v. Holman*, 295 Kan. 116, 147, 284 P.3d 251 (2012).

This court reviews the district court's decision to allow an amendment under K.S.A. 22-3201(e) for an abuse of discretion. See *State v. Bischoff*, 281 Kan. 195, 205,

22

131 P.3d 531 (2006). A trial court abuses its discretion when (1) committing an error of law; (2) committing an error of fact, or (3) no reasonable person would take the view adopted by the trial court. Moreno, as the asserting party, bears the burden of establishing such an abuse of discretion. See 281 Kan. at 205 (citing S*tate v. Sanchez-Cazares*, 276 Kan. 451, 454, 78 P.3d 55 [2003]).

Moreno has failed to meet the burden to show that the district court abused its discretion. He does not argue on appeal that the amendment charged a new or different crime or that the amendment violated his substantial rights. Moreno argues only that allowing the amendment was an abuse of discretion because the State admitted it did not know the location of the field where the beating took place. However, statutory venue exceptions allow a prosecution to occur in any county where the evidence shows the criminal acts occurred or in more than on county if the precise location cannot be readily determined because the acts occurred on or near the border between counties.

A review of the record shows the jury could have considered at least three pieces of evidence introduced before the close of the State's case to prove that the field was "on or near" the boundary between the two counties:  (1) The county line was approximately "five to seven minutes" from the Country Corner in Deerfield, in Kearny County; (2) Moreno and Dominguez drove west from the field and it was "maybe-like a five minute drive" to the Country Corner; and (3) Moreno's vehicle entered the parking lot of the Country Corner from the southwest, from the direction of Lakin, in Kearny County. Given this testimony, the State sought to amend the complaint to say that the attempted murder could have occurred in either county. Based on the evidence presented at trial, the trial court's decision to allow the State to amend the complaint to include both counties was reasonable and was not an abuse of discretion.

*Venue*

Moreno next contends that venue in Finney County was improper for the attempted murder charges because the State failed to present any evidence to show where the boundary ran between Finney and Kearny Counties and, thus, failed to prove that Finney County was the proper venue.

Normally, criminal charges must be brought in the county where the crime was committed. K.S.A. 22-2602. However, there are exceptions through which a defendant may be prosecuted in any one of several counties. K.S.A. 22-2604 contains the relevant venue exception here: "Where a crime is committed o*n or so near the boundary* of two or more counties *that it cannot be readily determined in which county the crime was committed*, the prosecution may be in any of such counties." (Emphases added.) Another exception allows for a prosecution to occur in any county where separate acts constituting a crime occurred in separate locations. See K.S.A. 22-2603.

The statutory venue provisions are considered jurisdictional; thus, an appellate court's standard of review when reviewing these statutes is de novo. *State v. Castleberry*, 48 Kan. App. 2d 469, 474-75, 293 P.3d 757 (2013), *aff'd* 301 Kan. 170, 339 P.3d 795 (2014). The venue exceptions are based on the commonsense notion that a criminal should not escape punishment because the crime's exact location was concealed. *State v. Grissom*, 251 Kan. 851, 889, 840 P.2d 1142 (1992). Nonetheless, the proof of the proper venue for trial is a jurisdictional fact that the State must prove in every case. The jury should determine venue based on the evidence as presented. *State v. Hunt*, 285 Kan. 855, 859, 176 P.3d 183 (2008). A verdict may be supported by circumstantial evidence if that evidence provides a basis from which the fact-finder may reasonably infer the existence of the fact in issue. However, the evidence need not exclude every other reasonable conclusion or inference. *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 (2008).

The fourth amended complaint alleged that the two counts of attempted first-degree murder occurred "in Finney County or Kearny County, Kansas." Similarly, the trial court instructed the jury that to find Moreno guilty of those charges, it must find the acts leading to the charges "occurred on the 9th day of October, 2016, *on or so near the* Finney County/Kearny County, Kansas, *boundary that it cannot be readily determined in which* of those two counties *the crime was committed*." (Emphases added.) The trial court also instructed the jury it was permitted to use its "common knowledge and experience in regard to the matter about which a witness has testified."

In his brief, Moreno correctly explains the importance of venue as a constitutional right under both the United States and Kansas Constitutions. Nonetheless, he acknowledges that the Kansas Legislature enacted K.S.A. 22-2604 as an exception to the requirement that criminal cases should be prosecuted "'in the county where the crime was committed.'" By arguing that the State failed to present any evidence on where the boundary between Finney and Kearny Counties was, Moreno is arguing that the State presented insufficient evidence to establish that venue was proper in Finney County. As a result, this court considers all the evidence in the light most favorable to the prosecution to determine if a rational fact-finder could have found that the criminal acts occurred "on or so near" the Finney/Kearny County border that it cannot readily be determined where the crime was committed. See *Hunt*, 285 Kan. at 859-60 (discussing venue as both a factual question to be determined by the jury and a legal question as related to a jurisdictional challenge on appeal).

Before resting its case, the State presented the following evidence relating to the location of the field: (1) Officer Mindrup testified that the county line separating Finney and Kearny Counties was approximately "five to seven minutes" from the Country Corner in Deerfield, in Kearny County; (2) Dominguez testified that Moreno drove the car west from the field and it was "maybe-like a five minute drive" to the Country Corner; and (3) employees at the Country Corner testified that Moreno's vehicle entered

25

the parking lot from the southwest, from the direction of Lakin, in Kearny County. Moreno later testified regarding his recollection of the route he had taken to arrive at the field and then about leaving the field by driving west for a short time and turning right to drive south before arriving at the Country Corner.

Based on that testimony, there was sufficient evidence for a jury to find that the beating occurred by a field on or so near the border between Finney and Kearny Counties that it could not be determined in which county the acts had occurred. Despite Moreno's testimony he drove south toward Deerfield, a rational fact-finder could have found that if both the field and the Finney/Kearny County line were a five-minute drive from the gas station in Deerfield, the field may have been close to the boundary line. A juror from Finney County could use their "common knowledge and experience" of the area to infer from the testimony that the field was so near the county line that it could not determine in which county the beating had occurred.

Dominguez testified that she did not know where the events took place. Moreno specifically stated in his testimony that he only knew they were on a gravel road. It is precisely this type of situation why K.S.A. 22-2604 was enacted. Venue was proper in Finney County for the attempted murder charges.

### WAS THERE SUFFICIENT EVIDENCE TO PROVE MORENO COMMITTED AGGRAVATED KIDNAPPING IN FINNEY COUNTY?

Moreno argues insufficient evidence supported the finding that the bodily harm element of aggravated kidnapping occurred in Finney County and this court should reverse his conviction as a result.

When an appellant challenges the sufficiency of the evidence in a criminal case, this court will review all the evidence in a light most favorable to the prosecution. To find

26

that the evidence is sufficient, the appellate court must be convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. This court does "'not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

To convict a defendant of a crime, the prosecution must prove each element of the crime beyond a reasonable doubt. *State v. Brown*, 303 Kan. 995, 1001, 368 P.3d 1101 (2016). Moreno was convicted of aggravated kidnapping, in violation of K.S.A. 2016 Supp. 21-5408(b), and the trial court instructed the jury:

> "To establish this charge, each of the following claims must be proved:
> "1.  The defendant took or confined Lisette Dominguez by force.
> "2.  The defendant did so with the intent to hold Lisette Dominguez to inflict bodily injury or terrorize Lisette Dominguez.
> "3.  *Bodily harm was inflicted upon Lisette Dominguez.*
> "4.  These acts occurred on the 9th day of October, 2016 *in Finney County*, Kansas." (Emphases added.)

The Kansas Supreme Court has noted that bodily harm has been defined as "'any touching of the victim against the victim's will, with physical force, in an intentional, hostile and aggravated manner,'" but had since been narrowed to include "only unnecessary acts of violence upon the victim and those occurring after the initial abduction constitute 'bodily harm.'" *State v. Peltier*, 249 Kan. 415, 421-22, 819 P.2d 628 (1991) (quoting *State v. Royal*, 234 Kan. 218, 222, 670 P.2d 1337 [1983]; *State v. Taylor*, 217 Kan. 706, 714, 538 P.2d 1375 [1975]).

Moreno contends on appeal that the State presented no evidence to prove the bodily harm element. Moreno points out the State argued at trial the bodily harm could have been satisfied by evidence that (1) Moreno grabbed Dominguez by the hair in the Wagon Wheel Trailer Park in Garden City, in Finney County, and pulled her hair out; (2) Dominguez injured her finger while being pulled away from the trailer; and (3) Moreno injured Dominguez when he grabbed her because she fell down and could not stand up when he told her to "get up or else." Further, the testimony presented by the State established only that Moreno had grabbed Dominguez by the hair and pulled her back to the vehicle, but there was no report of any injury or bodily harm from this action. Moreno notes he testified that he may also have pulled Dominguez' hair out during the beating at the field.

Moreno goes on to argue that only one witness testified Dominguez' finger injury had occurred at the trailer park, while the rest of the testimony showed this injury occurred later during the beating in the field. As to the third instance, Moreno admits there was evidence of a beating in the vehicle before Dominguez fled to the trailer, but contends that this injury had occurred before the taking and, thus, could not satisfy the element of bodily harm occurring in Finney County as part of the aggravated kidnapping.

The State responds by arguing in addition to the testimony that Moreno grabbed Dominguez by the hair and pulled her away from the trailer, medical personnel who treated Dominguez suggested she had bald spots on her head and injuries occurred during this action. And there was evidence that the finger injury occurred at the trailer. The State also argues that Dominguez was "guarded" in her testimony because she did not want Moreno to get in trouble, which explained why her account of the events at trial differed from what she had told officers, medical personnel, and her family members right after the event. As a result, the State argues the jury made a credibility determination when confronted with the differing testimony. As to the incident where Dominguez fell down after being grabbed at the trailer and was unable to walk, the State points out that

28

Dominguez told witnesses Moreno beat her in his car near the entrance to the Wagon Wheel Trailer Park—in Finney County—before fleeing the car.

When examined in the light most favorable to the State, the testimony of witnesses Dominguez had spoken to after Moreno's arrest was sufficient evidence on which a rational fact-finder could have found him guilty of aggravated kidnapping. Moreno's only real argument against his conviction is that the bodily harm did not occur in Finney County during or after the kidnapping.

The Kansas Supreme Court has said that the aggravated kidnapping statute does not require the bodily harm to occur after the actual kidnapping. See *State v. Smith & Miller*, 224 Kan. 662, 674, 585 P.2d 1006 (1978), *modified on other grounds* 225 Kan. 199, 588 P.2d 953 (1979). In fact, a panel of this court held the same in *State v. Dunerway*, No. 111,457, 2015 WL 5224703, at *14 (Kan. App. 2015) (unpublished opinion). In *Dunerway*, the defendant was convicted of aggravated kidnapping after he hit the victim with a two-by-four and immediately thereafter demanded she leave his apartment, then he grabbed her by the hair and dragged her out of the apartment. Our court held that there was sufficient evidence to convict the defendant of aggravated kidnapping even though he never physically harmed the victim after forcing her to leave. 2015 WL 5224703, at *14.

Moreno points out that there was evidence presented at trial of a beating in the vehicle before Dominguez fled to the trailer, but he contends this injury had occurred before the taking and, thus, could not satisfy the element of bodily harm occurring in Finney County as part of the aggravated kidnapping. The State had elected to use evidence of this act to support the aggravated battery charge, but the multiple acts instruction did not specifically include the aggravated battery charge. As a result, a question remains whether the State could use evidence of the beating in the vehicle prior to Dominguez fleeing to the trailer to support the bodily harm element of aggravated

kidnapping. Moreno had previously argued that the elections made by the State made some of the charges multiplicitious but does not raise this issue on appeal.

There was evidence to support the State's claim that Moreno pulled out Dominguez' hair. After Dominguez fled to the trailer, Moreno grabbed her by the hair and pulled her back to the car. Officer Muniz took a photograph of blood and hair on the center console of Moreno's vehicle. Meier, the forensic nurse at Wesley Medical Center took pictures of bald spots and abrasions on Dominguez' head and helped her clean the blood out of her hair.

As to the finger injury, one witness testified that Dominguez said that the doorknob to the trailer injured her finger while Moreno pulled her away from the trailer. Then, while being dragged, Dominguez fell and could not walk because of the pain and Moreno told her to get up and placed her back in the backseat of the car. The State presented evidence that Moreno hit and slammed Dominguez into the car door just before she fled to the trailer, which was the reason she was in pain. These actions fulfilled the elements of aggravated kidnapping and occurred while at the Wagon Wheel Trailer Park in Garden City, in Finney County. For these reasons, we find that there was sufficient evidence to support Moreno's conviction for aggravated kidnapping.

WAS THERE SUFFICIENT EVIDENCE TO
SUPPORT MORENO'S INTIMIDATION OF THE VICTIM CONVICTION?

Moreno argues on appeal that the evidence supporting the intimidation of a victim conviction was insufficient because he made the statement before being charged with any crime. As a result, Moreno argues he was not preventing Dominguez from attending or testifying at a purely hypothetical criminal proceeding at that point in time. The State responds that it presented evidence to show Moreno was upset while being arrested and

yelled to Dominguez not to speak to law enforcement, thereby trying to prevent her from providing evidence that would be used against him during the prosecution.

For a sufficiency of the evidence challenge, this court reviews all the evidence in a light most favorable to the prosecution to determine if a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. This court does "'not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *Chandler*, 307 Kan. at 668. To convict a defendant of a crime, the prosecution must prove each element of the crime beyond a reasonable doubt. *Brown*, 303 Kan. at 1001.

Moreno was charged with aggravated intimidation of a victim, in violation of K.S.A. 2016 Supp. 21-5909(b)(1), but the jury convicted him of intimidation of a victim, a lesser included offense. The trial court instructed the jury on intimidation of a victim:

"To establish this charge, each of the following claims must be proved:

"1.  The defendant attempted to prevent or dissuade Lisette Dominguez from attending or giving testimony at any criminal proceeding authorized by law.

"2.  This act was done with the intent to thwart or interfere in any manner with the orderly administration of justice.

"3.  This act occurred on the 9th day of October, 2016, in Finney County, Kansas."

Moreno argues that the State presented insufficient evidence to support the intimidation of a victim conviction because he made the statement that allegedly supported the conviction before being charged with any crime. As a result, Moreno argues he was not preventing Dominguez from attending or testifying at a criminal proceeding at that point in time. The State responds by arguing that Moreno made this statement to avoid facing any criminal charges by seeking to prevent Dominguez from providing evidence that could be used against him at a later date.

31

When examined in the light most favorable to the State, the evidence was sufficient for a rational fact-finder to find Moreno guilty of intimidation of a victim. While it is true that no charges had yet been filed when Moreno told Dominguez not to tell law enforcement anything, the circumstances suggest that he was trying to prevent a key potential witness from testifying in the future. The statute includes exactly this situation, and there is also caselaw to support the State's position. See K.S.A. 2018 Supp. 21-5909(a)(2)(A). In *State v. Reed*, 213 Kan. 557, 559, 516 P.2d 913 (1973), the Kansas Supreme Court held that a witness intimidation charge under the previous version of the statute could be based on acts committed before being formally charged. A panel of this court noted that in domestic violence situations, the offender knows he or she has committed a crime and that the victim is a potential witness. See *State v. Martin*, No. 96,972, 2007 WL 2768038, at *3 (Kan. App. 2007) (unpublished opinion) ("Knowledge that someone may be a witness against you for a crime you have committed does not magically spring into existence only when a prosecutor files a complaint and lists that witness by name in court papers.").

As a result, there was sufficient evidence to support Moreno's conviction because he would have known that Dominguez would be a witness against him before being arrested and then charged.

Affirmed.